# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JENNIFER MARIE LENZEN, | Civil No. 10-2147 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| WORKERS COMPENSATION REINSURANCE ASSOCIATION, | |
| Defendant. | |

Michael A. Fondungallah, **FONDUNGALLAH & KIGHAM, LLC**, 2499 Rice Street, Suite 145, St. Paul, Minnesota 55113, for plaintiff.

Rhiannon C. Beckendorf and Kerry L. Middleton, **LITTLER MENDELSON, PC**, 80 South 8th Street, Suite 1300, Minneapolis, Minnesota 55402, for defendant.

Plaintiff Jennifer Lenzen ("Lenzen") worked for Workers' Compensation Reinsurance Association ("WCRA") as part of its administrative support staff. WCRA terminated her employment after thirteen years. Lenzen's amended complaint alleges that WCRA engaged in disability discrimination, failed to accommodate her disability, and retaliatorily discharged her in violation of the Americans With Disabilities Act ("ADA"). She also alleges disability discrimination and creation of a hostile work environment under the Minnesota Human Rights Act ("MHRA"), and retaliatory discharge in violation of Minnesota Stat. § 181.932. The Court will grant WCRA's summary judgment motion because WCRA has proffered legitimate business reasons for

terminating Lenzen, and Lenzen has not demonstrated those reasons to be pretextual. More fundamentally, summary judgment is also warranted as to all but one of Lenzen's claims because Lenzen has not made out a *prima facie* case.

## BACKGROUND[1]

WCRA is a nonprofit association that provides reinsurance to carriers and employers that self-insure against workers' compensation claims in Minnesota. (Aff. of Rhiannon C. Beckendorf, Ex. M, at 10-11, July 29, 2011, Docket No. 46 ("Cummins Dep.").)  WCRA hired Lenzen in 1995 as an administrative assistant; while her precise duties varied, Lenzen's job functions always revolved around administrative and clerical tasks.  (*Id.*, Ex. O at 14-16 ("Smith Dep."); *Id.*, Ex. A at 68 ("Lenzen Dep.").)  Carl Cummins is the Chief Executive Officer who oversaw the daily operations of WCRA. (Cummins Dep. at 8.)  Cindy Smith is one of four vice presidents who report directly to

---

[1] The Court will disregard the affidavits Lenzen submitted in opposition to WCRA's motion because they are inadmissible: they are variously irrelevant, and do not set forth facts, relevant to Lenzen's discrimination and retaliation claims, that are within the personal knowledge of the affiants. Fed. R. Civ. P. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also United States v. United States Gypsum Co.*, 340 U.S. 76, 85 (1950) (no requirement on summary judgment to admit irrelevant evidence); *El Deeb v. Univ. of Minnesota*, 60 F.3d 423, 429 (8th Cir. 1995) (court may not consider affidavits not satisfying the Rule 56 requirements). The Opinion by Gary M. Namie, Ph.D., which clearly purports to be an expert opinion, is inadmissible because, among other reasons, Lenzen never disclosed Dr. Namie as an expert, and the report does not set forth the information that Fed. R. Civ. P. 26(a)(2) requires.  The Gearing, Holmberg, and Conley affidavits are inadmissible because they contain allegations not based on personal knowledge, and which would otherwise not be admissible in evidence.  (*See generally* WCRA Reply Mem., at 13-16, Sept. 2, 2011, Docket No. 60 (enumerating further deficiencies).) Regardless of these deficiencies, nothing in the inadmissible affidavits would alter the Court's decision.

Cummins.   (Smith Dep. at 9-10.)   Smith became the VP of Operations in 2008. (Cummins Dep. at 11-12, 16; Decl. of Cynthia Smith ¶ 2, July 29, 2011, Docket No. 45.) Smith became Lenzen's supervisor sometime in 2000.  (*See* Lenzen Dep. at 69-71.)

## I.   LENZEN'S MEDICAL CONDITION AND WCRA'S ACCOMMODATIONS

In 2005 Lenzen's physician notified WCRA that Lenzen was suffering from nausea, fatigue, and unexplained abdominal pain.[2]  (Smith Dep. at 21-22; Lenzen Dep. at 258, Ex. 30.)  He requested that her work schedule be reduced, and that Lenzen be allowed to take a nap during the day as needed.  (Smith Dep. at 22-23.)  WCRA accommodated these work restrictions.  (Lenzen Dep. at 117-19; Smith Dep. at 21-24.) Lenzen also went on short term disability and, later, long term disability.  (Smith Dep. at 21-22.)  Lenzen remained on long-term disability until July 15, 2007.  (Lenzen Dep. at 229.)  Lenzen typically took naps over the lunch hour.  (*Id.* at 117.)  She made up the time later in the day, and never asked WCRA to pay for her nap time.  (*Id.* at 285.)

Notwithstanding her decreased duties, Lenzen was unable adequately to process claims mail, a function comprising approximately 80% of her reduced schedule as of August 2006.  (Lenzen Dep. at 225; Lenzen Ex. 25.)  WCRA reassigned this duty to another employee to accommodate Lenzen, and memorialized this change in a memorandum, which also attached a revised job description.  (Smith Dep. at 160-61;

---

[2] Lenzen testified that she is being treated for fibromyalgia and chronic fatigue syndrome. (Lenzen Dep. at 530.)

Lenzen Dep. at 225-227; Lenzen Ex. 25.)   The memo warned Lenzen that since her reduced schedule began in April 2005:

> WCRA has repeatedly reworked your position to accommodate your needs, but we have now reached a point where we are running out of major functions for you to perform.  Please be aware that if the new configuration of functions is not successful, there may not be a position available for you at the WCRA.

(Lenzen Dep. at 225-27; Lenzen Ex. 25.)   In October 2006, WCRA stated in another memorandum to Lenzen that "[i]f you become unable to consistently and/or successful[ly] perform the major functions of you[r] position . . . , we will be forced to terminate your employment.   Other staff members are unable to absorb your work functions on a frequent basis in addition[] to their own work."  (Lenzen Dep. at 229-31; Lenzen Ex. 26.)  Lenzen viewed the October 2006 memo not as a warning, but rather as a one-year long-term disability anniversary review, which was largely positive.  (Lenzen Dep. at 230.)

Lenzen's physician issued a Work Ability Form in May 2007 that indicated Lenzen was able to continue part time work with daily naps.  (Lenzen Dep. at 118; Lenzen Ex. 38.)   WCRA complied with the rest requirement – the only medical restriction of any kind that remained after July 15, 2007, when Lenzen went off long-term disability.  (Lenzen Dep. at 118-19, 229, 277-78, 552.)  WCRA allowed Lenzen to take a nap whenever she saw fit for the rest of her employment; Lenzen napped nearly every day.  (*Id.* at 117-19, 263-67, 276-79, 553; Smith Dep. at 21-24.)  WCRA never interfered with Lenzen's naptime.  (*Id.* at 265.)  Lenzen requested no further accommodation for the duration of her employment.  (*Id.* at 280-87, 552.)

In January 2008, after Lenzen went back to work full-time, WCRA promoted Lenzen to an "Administrative Staff II" position – a promotion WCRA had previously considered, but put on hold when Lenzen went on disability.  (Smith Dep. at 31-33; Lenzen Dep. at 390.)  By March 2008, WCRA again removed a major responsibility from Lenzen's job description because she was unable to keep up with her workload.  (Lenzen Dep. at 234; Lenzen Ex. 28).[3]  Her main remaining job function following this reconfiguration was scanning documents, a project that was not time sensitive.  (Lenzen Dep. at 234, 285.)  Lenzen recognized this job reconfiguration as a "good thing" and an accommodation by WCRA to keep her employed.  (*Id.* at 285-86.)

Lenzen's performance review covering the period of January 2008 - July 2008, while mixed, is very positive overall.  In the three categories comprising Lenzen's major job functions, Lenzen received two marks of "development needed," a mark of "strong performer," and a mark of "key contributor."  Smith gave Lenzen an overall rating of "key contributor," a category reserved for employees that "complete[] work accurately and in a timely manner," "demonstrate[] ability to apply policies and procedures accurately," and that "may exceed work expectations in some areas and fall short a bit in others, but overall position objectives and requirements are being met."  (Aff. of Michael Fondungallah, Ex. 25, Aug. 18, 2011, Docket No. 52.)  Although Smith expressed some concerns about Lenzen's job performance, neither Smith nor Cummins ever made a

---

[3] Lenzen alleges that this demotion was the result of her having been out ill for one week with the flu.

derogatory or critical comment about Lenzen's medical situation.  (Lenzen Dep. at 557-59.)  Lenzen never complained to any of the WCRA management about discrimination based on her medical condition.  (*Id.* at 571.)

## II.   LENZEN'S INTERACTIONS WITH SUPERVISOR CINDY SMITH AND THE NEUVEST INVESTIGATION

Lenzen alleges that after Smith was promoted to Vice President, Lenzen and other support staff became overworked, and the team-oriented atmosphere at the office disappeared.  (*Id.* at 82-94, 384.)  Lenzen claims that Smith gave her too much work, and was rude to her and other staff.  Lenzen also claims that Smith, knowing that stress was detrimental to Lenzen's health, intentionally inundated Lenzen with work in an effort to get rid of her.  On one occasion, Smith told Lenzen she was "sick and tired" of Lenzen wasting WCRA time and money.  (*Id.* at 296, 390-91.)  On another occasion, Smith told the entire support staff, "This group is the worst waste of my time.  You contribute nothing, period."  (*Id.* at 86.)  Smith directed this caustic demeanor at all WCRA support staff, including employees who did not have any medical condition.  (*Id.* at 366-67, 383-84, 392, 460-61.)  "My thought is," Lenzen stated at her deposition, "you don't have to have a disability to be discriminated against."  (*Id.* at 383.)  Smith's harsh treatment seemed to Lenzen to be related to her then-recent promotion to Vice President.  (*See id.* at 84, 349.)  Lenzen alleges that Smith's actions created a hostile work environment for the whole support staff.  (*Id.* at 284.)

On September 10, 2008, Smith accosted Lenzen at her desk in an allegedly threatening manner.  Smith stormed into her office and scolded Lenzen for wasting

WCRA's time and performing unnecessary tasks.  The confrontation left Lenzen sobbing.  (*Id.* at 295-299.)   Various of Lenzen's co-workers comforted Lenzen after the confrontation.  Lenzen subsequently prepared a letter that summarized the confrontation and expressed other concerns about Smith, and delivered it to Cummins.  (*Id.* at 300-04, 343, 387; Lenzen Ex. 40.)  The letter does not mention Lenzen's medical condition.  At this point Cummins had already decided to fire Lenzen because of her history of poor performance and disruptive behavior.  (Cummins Dep. at 123-24.)  Cummins decided not to do so following receipt of Lenzen's letter, however, because he thought the timing of her termination would be construed as retaliation for her complaint.  (*Id.* at 62.)

Cummins hired a neutral third-party, Sandra Gilbert of NeuVest Investigations, to investigate Lenzen's allegations about Smith.  (*Id.* at 50-51, 61.)  Cummins considered Lenzen's letter to be an attempt to preempt her termination, which Cummins presumed Lenzen knew was coming after she saw her employment file on his desk several days earlier.  (*Id.* at 74-76.)  Gilbert spent several days interviewing Lenzen, Smith, and seven other employees, and prepared summaries of the interviews that totaled more than 100 pages.  (Lenzen Dep. at 471; Lenzen Ex. 48.)  Cummins reviewed the summaries and concluded that Lenzen's complaints were unsubstantiated.  (Cummins Dep. at 62-65, 77; Lenzen Ex. 48.)  Lenzen alleges that Gilbert's interviews uncovered "overwhelming evidence" of workplace violations by Cindy Smith, and submits her own summary of the interviews.  (Aff. of Michael Fondungallah, Aug. 18, 2011, Docket No. 52 ("Gilbert Dep. Ex. 22").)  The summary states that one of the eight employees observed "unethical behavior / violation of WCRA policies or the law."  (*Id.*)  Four employees reported

"threats and/or yelling"; three reported "fear or concern[] about talking to Ms. Gilbert"; six reported "intimidation / harsh criticism"; one employee reported "harassment / illegal use of power over others / intimidation / being a monster of power," while another answered "somewhat" to this query.[4]  (*Id.*)

## III.   LENZEN'S BEHAVIOR IN THE WORKPLACE AND AT THE COMPANY RETREAT

According to WCRA, Lenzen repeatedly violated company policy by leaving work without permission and failing to follow procedures for reporting time off.  (Smith Dep. at 93-100; 244-46.)  For example, Lenzen would send emails instead of utilizing the automated time-off system, or submit a request and then leave before it was approved. (*Id.*)  Lenzen, by contrast, alleges that she always followed company policy for leaving the office and requesting time off, and moreover that Smith approved each of Lenzen's time off requests.[5]  At times, Lenzen had problems communicating professionally with her coworkers, some of whom found her aggressive and distracting.  (Lenzen Dep. at 58-60.)  Moreover, according to WCRA, Lenzen refused to follow direction from her

---

[4] Each of these statements ostensibly refers to Cindy Smith's behavior, though Lenzen's summary does not so specify.  The summary contains seventeen categories of "Staff comments recorded by Ms. Gilbert" and a yes/no breakdown for each of the employees interviewed.

[5] Lenzen testified that, per company policy, she utilized the time off system, and when she had to leave in the case of an emergency would notify another manager or the front desk of her departure.  (Lenzen Dep. at 394-98, 427-28, 440.)  Lenzen's "Time Off Request Status Report" from January 1, 2008 – September 30, 2008 shows that Smith approved each of Lenzen's requests, though the report does not indicate whether it represents a comprehensive summary of all requests that Lenzen submitted during that period.

supervisor Cindy Smith, and on several occasions insisted on speaking with her at inconvenient times.  (Smith Dep. at 57, 193-96, 238-39.)

WCRA alleges that Lenzen's disruptive behavior in the workplace continued into July and August 2008.  On various occasions, for example, Lenzen interrupted and inconvenienced her supervisor, and distracted fellow employees.  (*Id.* at 56-66.)  These instances include Lenzen openly questioning Smith's authority in front of coworkers, and interrupting Smith's conversation with an outside vender so persistently that Smith and the vendor had to walk away from her.  (*Id.*)  Lenzen sometimes recognized her behavior as inappropriate, and on one occasion sent an email to coworkers apologizing.  (Lenzen Dep. at 247; Lenzen Ex. 29.)   Lenzen stated: "Cindy described to me some are experiencing my return to a kind of 'in your face' and 'bossy' and 'demanding' right back at you attitude."   Lenzen acknowledged this "nasty," "not acceptable" behavior. (Lenzen Ex. 29.)

In September 2008, the entire WCRA staff attended a company retreat in Owatonna, Minnesota.  (Smith Dep. at 49, 53-54.)  The retreat activities included small group sessions to discuss work-related topics; each group had a coworker take notes and act as a moderator.  (*Id.* at 54-55.)  After the exercise, one of the group members in Lenzen's small group informed Cummins that Lenzen had completely disrupted discussion and prevented any discussion of the intended topic.  (Cummins Dep. at 120-21.)  Two other employees confirmed Lenzen's disruptions.  (*Id.* at 122, 256-57.)  During the small group, Lenzen asked whether the WCRA had in place a process for dealing with possible unethical or illegal behavior in the workplace.  (Lenzen Dep. at 293-94.)

Lenzen believes that her termination stemmed from this question at the retreat.  (*Id.* at 323-24, 326-27.)  She stated, "[I]f I hadn't opened my mouth at Owatonna, Mr. Cummins wouldn't have been talking about terminating me." (*Id.* at 568-71.)

## IV.   WCRA'S FIRING DECISION AND LENZEN'S FINAL CHANCE

On the drive back from the retreat, Cummins and Smith discussed Lenzen's disruptive behavior at the retreat, her unprofessional conduct in the workplace over the preceding several months, and her inability to complete her work on time.  (Smith Dep. at 48-68; Cummins Dep. at 124.)  Cummins felt that Lenzen's behavior at the retreat was the "last straw," and decided at that point to terminate Lenzen's employment.  (Cummins Dep. at 123-24.)  Neither Cummins nor Smith was aware of the substance of Lenzen's comments.  (Cummins Decl. ¶ 4; Smith Decl. ¶ 4.)  On returning to work, Cummins reviewed Lenzen's personnel file in connection with his decision to fire her.  (Cummins Dep. at 42, 179.)  Lenzen later saw her personnel file on Cummins desk.  (Lenzen Dep. at 387.)  Two days after she saw the file, Lenzen delivered to Cummins the aforementioned letter complaining about Smith.  (*Id.* at 300-04.)

According to WCRA, Lenzen's performance and conduct at work remained poor. (Cummins Dep. at 58-59.)  WCRA alleges that Lenzen gave insufficient notice of time off, had communications problems, and refused to comply with her supervisor's instructions.  (*Id.*)  Lenzen disputes this, alleging that following her demotion in March 2008 she did quality work and followed company procedures for requesting time off. (Lenzen Dep. at 394-98, 427-28, 440.)  On November 5, 2008, Cummins issued her a

final warning.  (*Id.* at 73, 77; Lenzen Dep. at 473; Lenzen Ex. 49.)  Lenzen signed the final warning letter without question or comment.[6]  The warning stated that if Lenzen's performance did not improve, and Lenzen did not regularly meet clearly defined benchmarks, her employment would be immediately terminated.  (Lenzen Ex. 49.)

## V.    TERMINATION

Following the final warning, Smith met with Lenzen every week to monitor her progress.  (Lenzen Dep. at 475-76, 487-88; Smith Dep. at 138-41.)  Lenzen failed to meet the minimum requirements of her revised job description, which required her to identify three quarters of a box of claim files each day, a minimum of 3.75 boxes per week.[7] (Lenzen Dep. at 477-78; Smith Ex. 16.)   She also continued to be disruptive and insubordinate to Smith.  For example, during a weekly status meeting on December 8, 2008, Smith conveyed to Lenzen that she was not meeting minimum performance expectations as to her scanning project.  (Smith Dep. at 135-41; Smith Ex. 16.)  Lenzen became defensive and "raised her voice to where it could be heard outside the conference room."  (Smith Ex. 16.)  Lenzen alleges that Smith informed her of a new deadline during the December 22, 2008 weekly progress meeting that was impossible for Lenzen to complete.  (Lenzen Dep. at 308-09.)  Lenzen argued with Smith about whether this

---

[6] Lenzen claims that she wrote a response to the letter addressing each point, though the letter appears not to be part of the record.

[7]  Lenzen alleges that this expectation was unreasonable in light of her other duties. (Lenzen Dep. at 479-80.)

assignment was part of her job description.   (*Id.*; Lenzen Ex. 53.)   WCRA terminated Lenzen's employment the next day, citing Lenzen's insubordination and continued failure to fulfill the requirements of her job.  (Lenzen Dep. at 518; Lenzen Ex. 53.)

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.   WCRA's SUMMARY JUDGMENT MOTION

Lenzen's claims must be analyzed under the three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Lenzen must make out a *prima facie* case of discrimination or retaliation.  WCRA can then rebut the presumption of discrimination or harassment by showing a legitimate – non-discriminatory and non-retaliatory – reason for its employment action.  If WCRA presents a legitimate reason for the employment action, Lenzen can prove discrimination or harassment by showing that

WCRA's explanation is pretextual. *Id.* at 804. If WCRA proffers a legitimate reason for its termination decision, however, the Court may skip the *prima facie* stage and move directly to consider whether Lenzen has demonstrated this rationale to be pretextual. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009).

### A.      Discriminatory Termination and Pretext

WCRA has provided a legitimate, nondiscriminatory reason for its termination of Lenzen. Specifically, WCRA claims that it terminated Lenzen for insubordination and failure to meet the minimum requirements of her job outlined in her final warning. *See Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028–29 (8th Cir. 2004) (poor performance is legitimate, non-pretextual reason for adverse employment action); *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) (insubordination and violations of company policy are legitimate reasons for termination, assuming these policies are not discriminatory). The Court will therefore move directly to the issue of whether Lenzen has shown this rationale to be mere pretext for termination based on her medical condition.[8]

---

[8] Lenzen must make the threshold showing that her medical condition – depression, fibromyalgia, and chronic fatigue syndrome – amounts to a disability within the meaning of the ADA. The Court will assume without deciding that Lenzen is "disabled" within the meaning of the ADA. Even assuming that Lenzen is disabled, and further, that she presents sufficient evidence to make out a *prima facie* case – *see Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 684 (8th Cir. 2003) (enumerating elements) – summary judgment is warranted because Lenzen has not demonstrated that WCRA's termination rationale is pretextual.

Lenzen can demonstrate pretext by showing that WCRA's explanation for its termination is (1) unworthy of credence because it is without basis in fact, or (2) by persuading the court that discrimination is the more likely motivating factor behind Lenzen's termination. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Id.* Showing pretext requires more substantial evidence than the evidence required to make a *prima facie* case because evidence of pretext is viewed in light of the employer's justification. *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1111 (8th Cir. 2001)

WCRA's non-discriminatory explanation for terminating Lenzen is firmly rooted in fact. Lenzen admits that at times she was unable to process the minimum 3.75 boxes of claim files per week, though she alleges that the requirement was unfair in light of her other responsibilities. This requirement was one of the major functions identified in the revised job description attached to Lenzen's Final Warning, which provided that failure to meet these minimum requirements would result in immediate termination. (Lenzen Ex. 49.) Lenzen's admission of her failure to meet a minimum benchmark of her job description shows that WCRA's termination rationale is based in fact.

Lenzen may also show pretext by persuading the court that discrimination is the more likely reason for her termination. *Torgerson*, 643 F.3d at 1047. Lenzen argues that triable fact questions exist about whether she was, in fact, insubordinate in her dealings with Smith, or whether WCRA's reports to this effect are the result of Cummins and Smith's plan to fire her on account of her medical condition. The most persuasive record

evidence to which Lenzen points are her January 2008 promotion and her positive employment review covering the period January 2008 – July 2008.[9]   As of July 2008 Lenzen's termination did not appear to be on the horizon; it seems strange that WCRA would promote Lenzen in January 2008, provide her with a positive review in July 2008, and then terminate her on account of insubordination and an alleged inability to do her job in December of the same year.   Lenzen's position, in effect, is that both the NeuVest Investigation and her "final chance" were a charade, and that Cummins and Smith planned to terminate her because of her medical condition regardless of job performance.

The Court is not persuaded that WCRA's rationale is a pretext for disability discrimination.   First, the timeline of Lenzen's termination does not permit a reasonable inference that WCRA terminated Lenzen on account of her medical condition.   Lenzen

---

[9] Lenzen also points to the following facts to show that WCRA's termination rationale is pretextual: (1) Cummins' refusal to remove Smith as Lenzen's supervisor and to allow a witness to meetings between them, (2) WCRA's dismissal of Lenzen's concerns about certain workplace violations in July 2008, (3) Smith's complaints about Lenzen's attendance problems in the face of Smith's approval of each request Lenzen submitted, (4) WCRA's dismissal of Lenzen's September 2008 allegations about Smith's workplace violations, (5) Cummins's insistence that Lenzen report weekly to Smith, (6) Cummins's decision to terminate Lenzen upon hearing of her disruption, rather than first uncovering precisely what happened in Owatonna.   (Pl.'s Mem. at 27.)

None of this evidence – considered individually or collectively, and viewed in the light most favorable to Lenzen – persuades the Court that Lenzen's medical condition is the more likely motivating factor behind Lenzen's termination.   Indeed, most of these facts have nothing to do with Lenzen's medical condition, but rather relate to Cummins's judgments about how to run the company.   Only WCRA's claims about Lenzen's alleged violations of company policies are potentially relevant to the determination of whether her termination was rooted in unlawful discrimination.   The Court need not rely on Lenzen's alleged violations of company policy by improperly utilizing the time-off system because Lenzen admits to being unable to complete the minimum tasks laid out in her final job description.   *See Henthorn*, 359 F.3d at 1029 (noting admittedly sub-par performance as legitimate, non-pretextual rationale for adverse employment action).

was promoted after her medical restrictions were lifted, and demoted several months later because she could not keep up with her work.   She was only fired after Cummins received multiple reports of her disruptive behavior at the Owatonna conference – an event completely unrelated to her medical condition – and after Lenzen admittedly failed to fulfill at least one of the specifications in her final, revised job description.  (Lenzen Dep. at 506-08, 511, 518.)  Receiving favorable reviews in the past does not undermine the importance of these later events.

Second, WCRA accommodated Lenzen's work restrictions for years, allowing her to take a nap every day.   WCRA repeatedly modified Lenzen's job duties to accommodate her medical condition, and Lenzen recognized the reconfiguration as a genuine attempt to keep her employed.  Third, Lenzen's behavior at work in the summer of 2008 was, by her own admission, on at least one occasion "in your face," "bossy," "demanding," and "not acceptable at all."  (Lenzen Dep. 247; Lenzen Ex. 29).  And while Lenzen claims that her alleged insubordination was a function of Cummins and Smith's scheme to fire her, she does not deny specific instances of disruptive behavior, such as interrupting Smith's conversation with an outside vendor so persistently that Smith and the vendor were forced to walk away from her.  (*See* Smith Dep. at 56-66.)[10]

In sum, even assuming that Lenzen has presented enough evidence to make out a *prima facie* case of disability discrimination, she has not demonstrated that WCRA's

---

[10] Nor does the record support Lenzen's speculation that the WCRA fired her to save on health insurance costs.  Indeed, Lenzen testified that her termination was in retaliation for her question at the Owatonna conference, and nothing else.

proffered termination rationale is mere pretext. *See Stuart v. General Motors Corp.*, 217 F.3d 621, 635-36 (8th Cir. 2000) (finding that proof possibly sufficient to establish a *prima facie* case was insufficient to establish pretext).  Summary judgment on Lenzen's discrimination and retaliation claims is warranted on this basis alone.  Additionally, and more fundamentally, Lenzen has failed to make out a *prima facie* case of each of her remaining claims.

### B.  ADA Retaliation Claim

To make out a *prima facie* case of retaliation under the ADA, Lenzen must show that (1) her conduct was statutorily protected, (2) WCRA took an adverse employment action, and (3) a causal connection between the protected conduct and the adverse action. *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997).  An employee's conduct is statutorily protected if the employee opposed an act or practice that the ADA made unlawful.  *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999).

The Court finds that Lenzen did not engage in statutorily protected conduct. Lenzen never complained to any of the WCRA management about the alleged disability discrimination; rather, Lenzen claims that her termination was the result of her question during small group at the Owatonna retreat.  These comments were unrelated to any practice that the ADA protects because she was not complaining of any specific conduct. Lenzen admits: "And I just asked the question.  And that's it.  Raised the question. . . .  I was like throwing ideas out . . .  It's just a thought, you know, in this world of ours." (Lenzen Dep. at 293-94.)  Lenzen does not claim that her question at the Owatonna

conference in any way referred to her medical condition or prior requests for accommodations, or that Cummins construed it as such when deciding to fire her.

Moreover, causation is lacking. Lenzen does not dispute that Cummins and Smith were not aware of the contents of her statement when Cummins made the termination decision. In other words, Cummins's decision to terminate Lenzen was connected to Lenzen's **behavior** at the Owatonna retreat, not the **substance** of her question. Therefore, even assuming Lenzen's statements to be statutorily protected, no causal connection exists between the substance of her comments and her termination. In sum, Lenzen has not made out a *prima facie* case of retaliation under the ADA.

### C.    Hostile Work Environment Claim

In order to maintain a hostile work environment claim under either the Minnesota Human Rights Act (MHRA) or the ADA, Lenzen must show: (1) she belongs to a protected group, (2) she was subject to unwelcome harassment, (3) a causal relationship between Lenzen's protected group status and the harassment, (4) the harassment affected a term, condition or privilege of employment, and (5) the employer knew or should have known about the harassment and failed to take proper action. *See Shaver v. Independent Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003) (hostile work environment claim actionable under the ADA); *see also Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (enumerating elements under Title VII); *Wenigar v. Johnson*, 712 N.W.2d 190, 205-06 (Minn. Ct. App. 2006) (enumerating elements under MHRA). The allegedly offending conduct must be "so intimidating, offensive, or hostile that it poisoned the

work environment." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999) (internal quotation marks omitted).

Even assuming Smith's caustic demeanor to have been so hostile as to poison the work environment, Lenzen cannot show a causal relationship between Lenzen's protected group status and the harassment.  She does not claim that Smith's treatment of her was unique or offer any evidence that the treatment was because of her disability; instead, Lenzen alleges that Smith created a hostile work environment **for the whole support staff** – including for those without any medical conditions.  Lenzen therefore cannot establish a causal relationship between her medical condition and the harassment, and her hostile work environment claim cannot survive summary judgment.

### D.     Failure to Accommodate Claim

The ADA requires that an employer make reasonable accommodations to the known physical limitations of an otherwise qualified employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business.   42 U.S.C. § 12112(b)(5)(A).   When an employee requests an accommodation, the employer must engage in an "informal, interactive process" to determine the employee's limitations and reasonable accommodations to overcome those limitations.  *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 862-63 (8th Cir. 2006). While the employee need not make a formal written request for an accommodation, she must provide the employer with enough information so that it "can be fairly said to know

of both the disability and desire for an accommodation." *Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002) (internal quotation marks omitted).

Lenzen argues that WCRA failed to engage in this interactive process and failed to provide her with reasonable accommodations. Lenzen's central claim is that WCRA did not provide Lenzen an adequate time and place for a nap, and did not volunteer to pay her for the time that she spent napping. Lenzen "brought her own pillow and had to sleep on the floor, as well as find an empty office or she slept at her desk." (Pl.'s Mem. at 5, Aug. 8, 2011, Document 51.) Further, Lenzen claims that after she went off disability on July 15, 2007, Smith refused to accept any further doctor's notes excusing Lenzen from work.

The failure to accommodate claim is without merit. The record amply evidences WCRA's many attempts to accommodate Lenzen; indeed, WCRA granted every accommodation Lenzen requested. WCRA never interfered with Lenzen's ability to take a nap, which she did nearly every day, as needed, for years. WCRA reduced Lenzen's hours, eliminated much of her workload, and allowed her to take a nap whenever she saw fit. WCRA had no obligation to offer to pay Lenzen for her nap time in addition to the various accommodations it already provided. *See Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (holding that the employer was not required to grant paid leave in excess of the employee's scheduled amount). That WCRA did not offer to pay Lenzen for the time she spent not working was not unreasonable especially because Lenzen took a nap almost every day. Moreover, Lenzen admits that she never requested that WCRA pay for her nap time; it is thus dubious that WCRA can be fairly said to have known about Lenzen's

desire for this accommodation. In view of WCRA's various attempts to accommodate Lenzen's medical condition, the Court will grant its motion as to the failure to accommodate claim.

### E.  Whistleblower Retaliation

Lenzen alleges that Cummins terminated her following the Owatonna conference in retaliation for comments she made there.[11] (Compl. ¶ 67.) The Minnesota whistleblower statute provides:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official[.]

Minn. Stat. § 181.932, subd. 1.

Lenzen must show that (1) she engaged in statutorily protected conduct, (2) WCRA took some adverse employment action, and (3) a causal connection between the two. *See Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). Lenzen's conduct is statutorily protected if her complaint implicates a federal or state law, she reported a suspected violation in good faith, and she alleged facts that, if true,

---

[11] Her brief in Opposition to WCRA's summary judgment motion also cites the complaints she lodged in the September 11, 2008 letter to Cummins as the basis for her unlawful dismissal. Both are discussed below.

would constitute a violation of the law.  *See Abraham v. Cnty. of Hennepin*, 639 N.W.2d 342, 354-55 (Minn. 2002).

Lenzen points to her September 11, 2008 letter to Cummins as documenting the "reports" protected by the Minnesota law.  Specifically, in the letter Lenzen reported a series of alleged Health Insurance Portability and Accountability Act (HIPAA) violations and workplace violations by Smith.  She also points to the question she lodged in Owatonna as prompting WCRA's retaliation.

Lenzen does not make out a *prima facie* case of whistleblower retaliation.  As to the September 11, 2008 letter, causation is lacking.  WCRA commissioned a third-party investigation into the allegations Lenzen reported on September 11, 2008.  Following Cummins's review of the investigator's summary, he concluded that the claims were without merit.  Lenzen disputes this conclusion, and submits a summary of the NeuVest reports, which tallies, among other things, other staff members' negative experiences with Cindy Smith.  Nothing in the record, including Lenzen's summary of the NeuVest report, suggests that Cummins fired Lenzen because of her September 11, 2008 complaint.  Indeed, Cummins had decided to terminate Lenzen **before** she submitted the September letter.

Moreover, Lenzen's question at the Owatonna retreat was not a "report" protected by the Act.  It was just a question.  *See Gee v. Minn. State Colls. & Univs.*, 700 N.W.2d 548, 555 (Minn. Ct. App. 2005) (employee's query not a report under the statute).  Lenzen did not intend to identify some unethical behavior at the Owatonna retreat that the Minnesota statute would protect.  (*See* Lenzen Dep. at 293-94.)  Furthermore, as with

Lenzen's ADA retaliation claim, causation is lacking: the **substance** of the Owatonna comment did not give rise to Lenzen's termination because Cummins was unaware of it when he decided to fire her. *See Buytendorp v. Extendicare Health Servs.*, *Inc.*, 498 F.3d 826, 836 (8th Cir. 2007) (declining to infer a causal connection where decisionmaker was unaware of the protected conduct). Rather, it was Lenzen's disruptive **behavior** that was the "last straw" in Cummins's decisionmaking process. The Court will grant WCRA's motion as to the Whistleblower Retaliation claim.

## CONCLUSION

Taking the evidence in the light most favorable to Lenzen, she has failed to make out a *prima facie* case on any of her claims except discriminatory discharge. Moreover, summary judgment is warranted on all of Lenzen's discrimination and retaliation claims because she has not demonstrated that WCRA's termination rationale was a mere pretext for discrimination or retaliation. WCRA provided every accommodation that Lenzen requested. Lenzen's supervisor treated her no differently than other non-disabled support staff. Lenzen did not engage in protected conduct, and she cannot refute WCRA's legitimate business reasons to terminate her employment. "[F]ederal courts do not serve as 'super-personnel departments,' sitting in judgment of an employer's business decisions absent evidence of discrimination." *Anderson v. Durham D&M, LLC*, 606 F.3d 513, 522 (8th Cir. 2010). The Court will grant WCRA's motion.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Workers Compensation Reinsurance Association's motion for Summary Judgment [Docket No. 41] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   December 30, 2011
at Minneapolis, Minnesota.                          _____s/ John R. Tunheim_____
                                                      JOHN R. TUNHEIM
                                                      United States District Judge